# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

EMMANUEL CARTAGENA-CORDERO,
    Plaintiff,

        v.

No. 3:19-cv-1728 (SRU)

FIVE STAR CARS, LLC, et al.,
    Defendants.

## <u>ORDER</u>

This is a case about a fraudulent used car sale.  In December 2018, Emmanuel Cartagena-Cordero bought a used 2008 Ford Super Duty F-250 SRW (the "Truck" or the "Vehicle") from Five Star Cars, LLC ("Five Star"), a used car dealership in Meriden, Connecticut.  Connected with that sale, Cartagena-Cordero alleges that Five Star violated (1) the Truth in Lending Act (the "TILA"), 15 U.S.C. § 1601, *et seq.* and 12 C.F.R. § 226, (2) the Federal Odometer Act (the "FOA"), 49 U.S.C. § 32701, *et seq.*, and (3) the Connecticut Unfair Trade Practices Act (the "CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq.*; breached (4) the implied warranty of merchantability, in violation of Conn. Gen. Stat. § 42a-2-314; and committed (5) civil forgery.[1]  Cartagena-Cordero makes a motion for entry of a default judgment against Five Star[2] and seeks $55,298.84 in actual, statutory, and punitive damages.  Cartagena-Cordero's motion, doc. no. 26, is **granted in part and denied in part**.  Cartagena-Cordero may recover $14,762.04.

## I.    Standard of Review

---

[1]    I have jurisdiction over Cartagena-Cordero's TILA and FOA claims pursuant to 28 U.S.C. § 1331, and I exercise supplemental jurisdiction over Cartagena-Cordero's state-law claims pursuant to 28 U.S.C. § 1367 because they are so related to Cartagena's TILA and FOA claims that "they form part of the same case or controversy."

[2]    Originally, there was a second defendant in this case:  Westlake Services, LLC d/b/a Westlake Financial Services ("Westlake").  *See* Compl., Doc. No. 1, at ¶ 4.  However, on June 24, 2020, Cartagena-Cordero gave notice that he voluntarily dismissed Westlake from this action.  *See* Notice of Voluntary Dismissal, Doc. No. 24.  Thus, the instant motion for default judgment concerns only Five Star, and this Order discusses Westlake only where relevant.

"Rule 55 of the Federal Rules of Civil Procedure establishes a two-step process for obtaining a default judgment." *Bennett v. United States*, 2017 WL 6993407, at *1 (D. Conn. Dec. 18, 2017) (citing *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)).  "First, a plaintiff must acquire an entry of default against the defendant in question." *Id.* (citing Fed. R. Civ. P. 55(a)).  "Second, after the default is entered, a plaintiff must either request a default judgment from the clerk or move the court for a default judgment." *Id.* (citing Fed. R. Civ. P. 55(b)). When the amount sought is neither a sum certain nor a sum that can be made certain by computation, the plaintiff must request a default from the court, rather than the clerk.  *See* Fed. R. Civ. P. 55(b).  The decision whether to enter a default judgment is entrusted to the "sound discretion of a district court." *ALV Events Int'l v. Johnson*, 821 F. Supp. 2d 489, 493 (D. Conn. 2010) (quoting *Shah v. New York State Dep't of Civil Serv.*, 168 F.3d 610, 615 (2d Cir. 1999)) (cleaned up).

In deciding whether to enter default judgment, courts in this Circuit typically focus on three factors:  (1) whether the default was willful, (2) whether denying the application for default would prejudice the movant, and (3) whether a meritorious defense exists.  *See Atl. Recording Corp. v. Brennan*, 534 F. Supp. 2d 278, 280 (D. Conn. 2008) (applying those three factors); *Palmieri v. Town of Babylon*, 277 F. App'x 72, 74 (2d Cir. 2008); *Pecarsky v. Galaxiworld.com Ltd.*, 249 F. 3d 167, 171–74 (2d Cir. 2001) (applying those three factors in reviewing district court's decision to enter default judgment).  Before entering a default judgment, a district court should also "determine whether the plaintiff's allegations establish the defendant's liability as a matter of law." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (quoting *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009)) (cleaned up).  "[A] defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint."

2

*Id.* (citing *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004)). The court should also draw "all reasonable inferences from the evidence offered" in favor of the moving party. *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).

Although "a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). "In deciding the extent of damages to be awarded in a default judgment, the court must consider several factors, including (1) the monetary award requested; (2) the prejudice suffered by the plaintiff; (3) whether or not the default is clearly established and (4) the nature of the plaintiff's claims against the defendant." *Rodsongs v. D & S Entm't, LLC*, 2005 WL 589321, at *1 (D. Conn. Mar. 11, 2005). Regarding "the scope of damage recovery pursuant to a default judgment," the Second Circuit has explained:

> The outer bounds of recovery allowable are of course measured by the principle of proximate cause. The default judgment did not give plaintiff a blank check to recover from defendant any losses it had ever suffered from whatever source. It could only recover those damages arising from the acts and injuries pleaded . . . .

*Greyhound Exhibitgroup*, 973 F.2d at 158–59 (cleaned up).

Upon entry of a default judgment, to determine the amount of damages to award, a district court "may conduct a hearing or it may make such a finding on the basis of documentary evidence if damages are ascertainable with reasonable certainty." *Hernandez v. Apple Auto Wholesalers of Waterbury LLC*, 2020 WL 2543785, at *6 (D. Conn. May 18, 2020) (quoting *Chance v. Karmacharya*, 2017 WL 5515951, at *1 (D. Conn. Mar. 20, 2017)). "A court may not just accept a plaintiff's statement of the damages, even in a default judgment." *Id.* (citing *Karmacharya*, 2017 WL 5515951, at *2; *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp. Div. of Ace Young, Inc.*, 109 F.3d 105, 111 (2d Cir. 1997)) (cleaned up).

3

## II.   Background

### A.   Procedural History

On November 4, 2019, Cartagena-Cordero filed this complaint against Five Star and Westlake Services, LLC d/b/a Westlake Financial Services ("Westlake").  On November 9, Cartagena-Cordero had Five Star served with the complaint.  *See* Executed Summons, Doc. No. 8.  Thus, Five Star's responsive pleading was due by November 30, but Five Star did not file anything by then.  On December 10, 2019, Cartagena-Cordero made a motion for an entry of default against Five Star pursuant to Fed. R. Civ. P. 55(a).  *See* Mot. for Default Entry, Doc. No. 10.  On December 11, I granted that motion.  *See* Order, Doc. No. 11.  On December 17, Cartagena-Cordero made a motion for an extension of time to file a motion for a default judgment against Five Star.  *See* Mot. for Ext. of Time, Doc. No. 12.  More specifically, Cartagena-Cordero asked for an extension of time until Cartagena-Cordero either filed a dispositive motion against Westlake or until the time of trial against Westlake.  *See id.*  On December 18, I granted Cartagena-Cordero's motion for an extension of time.  *See* Order, Doc. No. 13.

On February 28, 2020, Cartagena-Cordero made a motion for entry of a default judgment against Five Star.  *See* Mot. for J. and/or to Enforce Settlement Agreement, Doc. No. 14.  The same motion asked me to enforce a purported settlement agreement against Westlake, or, in the alternative, to enter a default judgment against Westlake, which also had not responded to Cartagena-Cordero's complaint.  *See id.*  On March 5, 2020, I granted in part and denied in part Cartagena-Cordero's motion.  *See* Order, Doc. No. 16.  With respect to Five Star, I took Cartagena-Cordero's motion under advisement.  *See id.*  With respect to Westlake, I denied without prejudice Cartagena-Cordero's motion because (1) Cartagena-Cordero's complaint did

4

not allege a breach of contract claim against Westlake and (2) Cartagena-Cordero had not made a motion for a default entry against Westlake. *See id.* On March 20, Cartagena-Cordero filed an amended complaint that included a breach of contract claim against Westlake. *See* Am. Compl., Doc. No. 18. On the same day, Cartagena-Cordero renewed his motion for enforcement of a settlement agreement and/or a default judgment against Westlake. *See* Renewed Mot. for J. and/or to Enforce Settlement Agreement, Doc. No. 19. On May 18, 2020, I denied that renewed motion without prejudice because Cartagena-Cordero had not yet served Westlake with the amended complaint. *See* Order, Doc. No. 20. Cartagena-Cordero then had Westlake properly served. *See* Acknowledgments of Service, Doc. Nos. 21 and 22.

On June 19, 2020, Cartagena-Cordero renewed his motion for default judgment against Five Star and explained that he had "reached an agreement with Westlake . . . to settle his claims against it." Second Renewed Mot. for J., Doc. No. 23, at 1. On June 24, Cartagena-Cordero dismissed his claims against Westlake with prejudice. *See* Notice of Voluntary Dismissal, Doc. No. 24. On July 21, 2020, I entered an order that explained I would treat Cartagena-Cordero's motion for judgment against Five Star as a motion for an entry of default against Five Star pursuant to Fed. R. Civ. P. 55(a), and I granted that motion. *See* Order, Doc. No. 25.[3] On August 4, 2020, Cartagena-Cordero once more renewed his motion for a default judgment against Five Star. *See* Third Renewed Mot. for J., Doc. No. 26.

B. <u>Factual Background</u>[4]

---

[3]    That order was superfluous because Five Star had already been in default since December 2019. *See* Order, Doc. No. 11.

[4]    The facts are taken from the original complaint, doc. no. 1, and from Cartagena-Cordero's affidavit and accompanying exhibits, doc. no. 26-4. Although Cartagena-Cordero filed an amended complaint in this matter—*see* Am. Compl., Doc. No. 18—that complaint was served only on Westlake. *See* Acknowledgments of Service, Doc. Nos. 21 and 22. It is the *original* complaint on which Five Star defaulted. *See* Order, Doc. No. 11. In any event, the distinction is inconsequential because, with respect to Five Star, the original complaint and the amended complaint are identical. *Compare* Compl., Doc. No. 1 *with* Am. Compl., Doc. No. 18 (adding ¶¶ 54–58 and 96–97, which relate solely to Cartagena-Cordero's breach of contract claim against Westlake).

On December 5, 2018, Cartagena-Cordero, a New Britain, Connecticut resident, visited Five Star, a used car dealership in Meriden, Connecticut. *See* Compl., Doc. No. 1, at ¶¶ 2–3, 9. Cartagena-Cordero visited Five Star because he was interested in the Truck, which he had seen advertised on cargurus.com. *See id.* at ¶ 9. Cartagena-Cordero alleges that he learned that the Truck was advertised for $15,999 when he got to the Five Star dealership.[5] Cartagena-Cordero alleges that that price did not disclose a dealer conveyance fee. *See id.* at ¶ 10. When Cartagena-Cordero arrived at Five Star on December 5, a representative told Cartagena-Cordero that other customers were also interested in the Truck but that Five Star would hold the Truck if Cartagena-Cordero paid a $200 deposit. *See id.* at ¶ 11. Cartagena-Cordero agreed to buy the Truck for $15,999 and paid the $200 deposit. *See id.* at ¶ 13. Cartagena-Cordero planned to return the next day to "complete the transaction." *Id.* Before agreeing to purchase the Truck, Cartagena-Cordero was "unable to test drive the Vehicle, because Five Star told him that the drive shaft required replacement." *Id.* at ¶ 12. To Cartagena-Cordero, though, the Truck "looked to be in an otherwise good condition." *Id.*

On December 6, Cartagena-Cordero returned to Five Star and paid an additional $3,000 towards a total down payment of $3,500. *See id.* at ¶ 14. (At that point, Cartagena-Cordero had paid $3,200 total.) Cartagena-Cordero also claims that he "executed a purchase order," but "unbeknownst to [him], Five Star increased the purchase price [from $15,999] to $16,500 and included a dealer conveyance fee of $699, which had not been previously disclosed to"

---

[5]      Cartagena-Cordero clarifies that he was told *orally* that the Truck was advertised for $15,999. *See* Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶ 6; Pl.'s Mem. of Law in Supp. Third Renewed Mot. for J., Doc. No. 26-1, at 17 ("While the advertisement that Plaintiff saw did not disclose a price, Plaintiff inquired about the advertised price at the dealership and was told it was $15,999."). Somewhat confusingly, Cartagena-Cordero submits with his affidavit an advertisement for the Truck from cargurus.com that advertises the Truck's price as $19,995. *See* Advertisement, Ex. 1 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 9–15. Cartagena-Cordero explains that that advertisement is from "after I purchased the" Truck, and that he "do[es] not know why the price listed in this version of the advertisement is $19,995." Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶ 4.

Cartagena-Cordero.  *Id.* at ¶ 15.  That purchase order also indicated, incorrectly, that the Truck's mileage was 110,659.  *See* Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶ 23.  Cartagena-Cordero explains that he "planned to finance the transaction," but he "did not execute a retail installment sales contract that day and was unaware that he needed to do so as part of a dealer-arranged financed transaction."  Compl., Doc. No. 1, at ¶ 16.  Cartagena-Cordero believes that Five Star increased the purchase price from $15,999 to $16,500 because "it planned to assign the retail installment sales contract to a discount finance company that would charge [a] fee or otherwise delay compensation in consideration of accepting the contract."  *Id.* at ¶ 17.  Thus, "to maintain suitable profit," Five Star "increased the cash price of the" Truck.  *Id.*  Cartagena-Cordero concludes:  The price increase "would not have been present in a comparable cash transaction and was incidental to the extension of credit."  *Id.*  Although Cartagena-Cordero wished to take delivery of the Truck on December 6, he "owed back properties taxes" and so "was unable to take delivery" that day.  *Id.* at ¶ 24.

On December 7, 2018, Five Star fraudulently (according to Cartagena-Cordero) executed a retail installment sales contract that it assigned to Westlake (the "Forged Contract").  *See id.* at ¶ 18.  That Forged Contract is signed electronically by Cartagena-Cordero in three places with a time stamp of 9:18:05 AM PST (12:18:05 PM EST).  *See* Forged Contract, Ex. 2 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 18, 21.  But Cartagena-Cordero "could not have signed the Forged Contract at that time, because he was bowling with friends in East Hartford, Connecticut."  Compl., Doc. No. 1, at ¶ 20.  Indeed, Cartagena-Cordero alleges that he never saw a copy of the Forged Contract until March 2019, when he requested it from Westlake.  *See id.* at ¶ 22.  In the Forged Contract, the "$501 increase to the cash price [of $15,999] was included as part of the amount financed in the itemization . . . instead of part of the finance charge."  *Id.* at ¶

21.[6]  The Forged Contract also included a $995 service contract with "A.U.L. Corp."  *See* Forged Contract, Ex. 2 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 17.  Cartagena-Cordero was also "unaware of this charge and had not agreed to it."  Compl., Doc. No. 1, at ¶ 23.  The Forged Contract also included a $699 charge to Five Star for "Doc Fee"; Cartagena-Cordero terms that charge a "dealer conveyance fee," of which he was also unaware.  *See id.* at ¶ 15; Forged Contract, Ex. 2 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 17.

On December 11, 2018, Cartagena-Cordero returned to Five Star to take delivery of the Truck.  *See* Compl., Doc. No. 1, at ¶ 25.  That day, no one at Five Star provided Cartagena-Cordero with a Connecticut DMV Form K-208, which Five Star was required to provide.  *See id.* at ¶ 26.  Also that day, Cartagena-Cordero signed a new first page of the purchase order that Cartagena-Cordero had executed in person on December 6.  *See id.* at ¶ 27.[7]  As described above, the original purchase order (incorrectly) listed the Truck's mileage as 110,659, but the new purchase order (correctly) listed the Truck's mileage as 112,820.  *See* Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶¶ 23, 35; Second Purchase Order, Ex. 3 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 22; Forged Contract, Ex. 2 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 16 (listing Truck's "Odometer Mileage" as 110,659).  Cartagena-Cordero alleges that Five Star decreased the mileage in the first purchase order because "it wanted the service

---

[6]  The Forged Contract itemizes the "Price of the Vehicle" as $17,655.32, which includes sales tax of $1,155.32.  *See* Forged Contract, Ex. 2 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 17.  Because $17,655.32 less $1,155.32 equals $16,500.00, I agree with Cartagena-Cordero that, in the Forged Contract, the "price of the vehicle" was listed as $16,500.00.  The second purchase order that Cartagena-Cordero submits in his support also confirms that the "cash price" at the time of sale was $16,500.  *See* Second Purchase Order, Ex. 3 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 23.
[7]  There is a discrepancy regarding why Cartagena-Cordero executed a new first page of the purchase order.  More specifically, it is unclear whether Cartagena-Cordero himself noticed the inaccuracy of the odometer reading reported on the first purchase order.  *Compare* Compl., Doc. No. 1, at ¶ 27 ("For reasons unknown to Plaintiff, Five Star asked Plaintiff to sign a new first page of the purchase order.") *with* Letter, Doc. No. 26-4, at 31 (explaining that "Mr. Cartagena-Cordero had noticed the discrepancy on the first page of the purchase order and Five Star gave him a new first page with the accurate mileage and retained the original first page.").  In any event, no matter the impetus, the second purchase order was necessary because the odometer reading on the initial purchase order was inaccurate.

contract that it had surreptitiously added to the Forged Contract to be in effect if Plaintiff brought the Vehicle back for repairs." Compl., Doc. No. 1, at ¶ 30.[8]  Although Cartagena-Cordero does not have a copy of the service contract, he has a picture "of a document that Five Star told [him] was the service contract," which states the Truck's mileage as 110,659. *See* Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶ 34; *see also* Service Contract, Ex. 3a to Aff. of Cartagena-Cordero, Doc. No. 26-4, at 25.

When Cartagena-Cordero took delivery of the Truck on December 11, "it smelled strongly of engine coolant." Compl., Doc. No. 1, at ¶ 31. Cartagena-Cordero, who had some "prior automotive experience," inquired about the smell because he thought the head gasket might have been leaking. *See* Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶¶ 26, 30. A Five Star representative told Cartagena-Cordero that Five Star had just "topped off" the coolant. *See* Compl., Doc. No. 1, at ¶ 31. About two weeks later, "the smell of coolant worsened," and Cartagena-Cordero noticed coolant leaking from the Truck. *Id.* at ¶ 32. Cartagena-Cordero called Five Star, and someone from Five Star requested that Cartagena-Cordero bring in the Truck. *Id.* at ¶ 33. After Cartagena-Cordero brought in the Truck, a representative from Five Star "stated that [Five Star] did not see a problem and declined to perform any repairs." *Id.* at ¶ 34.

---

[8]     Again, there is a confusing discrepancy between the complaint and Cartagena-Cordero's affidavit regarding the odometer readings, but, in my view, the discrepancy reflects a simple mix-up. In the complaint, Cartagena-Cordero (mistakenly) alleges that Five Star "*decreased* the mileage in the second purchase order, because it wanted the service contract that it had surreptitiously added to the Forged Contract to be in effect if Plaintiff brought the Vehicle back for repairs." Compl., Doc. No. 1, at ¶ 30 (emphasis added). Of course, though, Five Star actually *increased* the mileage in the second purchase order from 110,659 to 112,820. *See* Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶ 23 (noting correctly that the second purchase order "increased the stated mileage to 112,820 . . . from 110,659"); Second Purchase Order, Ex. 3 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 22. In addition to being supported by documentary evidence, Cartagena-Cordero's theory regarding Five Star's fraud makes sense only if Five Star submitted an artificially *low* odometer reading to the service contract administrator (as reflected in the first purchase order).

About one week later, on January 2, 2019, the Truck's exhaust "began emitting copious amounts of blue smoke," and Cartagena-Cordero "reasoned that the head gasket was blown." *Id.* at ¶ 35.  Cartagena-Cordero contacted Five Star again.  *See id.* at ¶ 36.  Initially, a representative from Five Star denied there was a problem and again refused to perform repairs.  *See id.* However, AJ Sakr, "who represented himself as the owner of Five Star, admitted that he drove the Vehicle for several thousand miles before listing it for sale and knew that the head gasket was defective." *Id.*[9]  Sakr then "agreed to undertake repairs, but he sought to perform the work under the service contract" that Five Star had "sold" Cartagena-Cordero, "even though the defect was present at the time of purchase and should have been repaired by Five Star" as warranty work (priced into the price of the Truck).  *Id.* at ¶ 37.  Indeed, a representative from Five Star told Cartagena-Cordero that he needed to wait a week before bringing in the Truck for repair.  *Id.* at ¶ 38.  Cartagena-Cordero alleges that Five Star wanted him to wait to bring in the Truck until "at least 30 days after purchase"; at that point, Five Star could "make a claim on his service contract" rather than repairing the Truck as warranty work.  *Id.* at ¶ 38.

Cartagena-Cordero claims that Five Star's desire to perform repair work under the service contract rather than as warranty work affected him negatively.  For instance, by "performing the work under the service contract, Five Star denied [Cartagena-Cordero] the ability to cancel that contract and obtain a full or partial refund." *Id.* at ¶ 40.  Further, because "there are limits upon the amount of benefits obtainable under the service contract," by performing work under that contract, "Five Star limited the potential future coverage under the contract by submitting the claims for coverage." *Id.*  As Cartagena-Cordero explains:  "When I brought [the] Vehicle in for repairs, the Vehicle's odometer read approximately 113,515.  Though I had actually driven the

---

[9]        "Assad Sakr" is a registered agent for service for Five Star.  *See* Executed Summons, Doc. No. 8, at 2.

Vehicle less than a thousand miles, it would appear to the service contract administrator that I had driven the Vehicle almost 3,000 miles.  And by making me wait until more than a month after purchase, it would give the false impression to the service contract administrator that the problem with the engine manifested after purchase instead of being present when I bought the Vehicle."  Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶ 37.

In any event, Five Star's repairs were "inadequate and insufficient."  Compl., Doc. No. 1, at ¶ 41.  The Truck "continued to emit blue smoke."  *Id.*  In April 2019, Cartagena-Cordero thus brought the Truck to a Ford dealership; there, Cartagena-Cordero was told that the Truck's engine required an expensive rebuild.  *Id.*; *see also* Letter, Doc. No. 26-4, at 30 n.1.  The inspection cost $154.21.  *See* Ford Quote, Ex. 4 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 35–37.  The Ford dealership also "identified that the Vehicle had defective front left, upper and lower ball joints, worn out pads and rotors in the front brakes and blown front and rear shocks."  Compl., Doc. No. 1, at ¶ 42; *see also* Ford Quote, Ex. 4 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 35–37.  Cartagena-Cordero concludes that "[e]ither Five Star failed to undertake [] inspection [before selling] or sold the Vehicle despite the presence of the defects."  Compl., Doc. No. 1, at ¶ 42.  Finally, Cartagena-Cordero explains that the Truck was sold to him "without having undergone emissions [testing]," and so Cartagena-Cordero "received a notice of a fine shortly after" he bought the Truck.  *Id.* at ¶ 44.  Cartagena-Cordero alleges that he paid the fine ($20) and brought in his Truck for emissions testing.  *See id.* at ¶ 45.  On May 1, 2019, Cartagena-Cordero made written demand (through counsel) on Five Star for the cost of the repairs, but Five Star refused.  *See id.* at ¶ 46.  Cartagena-Cordero claims that he has so far replaced the shocks, the piston rings, and the head gasket at a cost of $7,738.  Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶ 56.

11

### III. Discussion

I hold that, in connection with its sale of the Truck to Cartagena-Cordero, Five Star violated the TILA, FOA, and CUTPA, breached the implied warranty of merchantability, and committed civil forgery. I also hold that entering a default judgment against Five Star is proper because Five Star's default has been willful,[10] Five Star does not appear to have any meritorious defenses,[11] and Cartagena-Cordero would suffer prejudice if I did not grant him a default judgment against Five Star.[12] However, Cartagena-Cordero is not entitled to all the actual, statutory, and punitive damages that he seeks.

#### A. Liability

##### a. TILA

Congress's purpose in enacting the TILA was "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). "The requirements of the TILA are highly technical but full compliance is required." *Clement v. Am.*

---

[10]     "[T]he failure of [a Defendant] to appear in the action and respond to the Complaint, despite being properly served, sufficiently demonstrates willfulness." *Andrus v. Juniper Grp., Inc.*, 2011 WL 4532694, at *7 (E.D.N.Y. Sept. 26, 2011); *see also Bridge Oil Ltd. v. Emerald Reefer Lines, LLC*, 2008 WL 5560868, at *2 (S.D.N.Y. Oct. 27, 2008) ("Since Defendants have been entirely unresponsive, their continued failure is willful."). Here, Five Star has been validly served but has not appeared on the docket or responded in any way. Thus, Five Star's default is willful.

[11]     A sufficient showing of a meritorious defense would consist of "evidence of facts that, if proven at trial, would constitute a complete defense." *SEC v. McNulty*, 137 F.3d 732, 740 (2d Cir. 1998) (quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 98 (2d Cir. 1993)) (cleaned up). Courts have held that where a plaintiff has established a defendant's liability and the defendant has not filed an answer, the plaintiff has satisfied this element. *See, e.g.*, *Andrus*, 2011 WL 4532694, at *7; *Emerald Reefer*, 2008 WL 5560868, at *2. In this case, as I explain, Cartagena-Cordero has established liability on all his claims, and it does not appear that Five Star—which did not file an answer or anything else—has any meritorious defenses.

[12]     When a plaintiff has no additional steps available to secure judicial relief, it would prejudice that plaintiff to deny that plaintiff's motion for a default judgment. *See, e.g.*, *Andrus*, 2011 WL 4532694, at *7; *Emerald Reefer*, 2008 WL 5560868, at *2; *Mason Tenders Dist. Council v. Duce Constr. Corp.*, 2003 WL 1960584, at *3 (S.D.N.Y. Apr. 25, 2003) ("In light of Defendants' failure to respond, there is no indication that requiring Plaintiffs to take further steps prior to a determination on the merits would be effective in eliciting a response from Defendants."). Here, Five Star has been in default since December 2019, and Cartagena-Cordero has no further additional steps available to him to secure a judicial remedy.

*Honda Fin. Corp.*, 145 F. Supp. 2d 206, 210 (D. Conn. 2001) (cleaned up).  "Even minor

violations of the [TILA] can not [*sic*] be ignored."  *Id.* (cleaned up).  "The TILA is a remedial act

intended to protect consumers and, as such, its provisions are to be construed liberally in favor of

consumers."  *Id.* (cleaned up).  The "TILA achieves its remedial goals by a system of strict

liability in favor of the consumers when mandated disclosures have not been made."  *Id.* (cleaned

up).  "The court need find only a single violation of the statutory requirements to hold a

defendant liable under the TILA."  *Id.* (cleaned up); *see also* 15 U.S.C. § 1640 ("[A]ny creditor

who fails to comply with any requirement imposed under this part . . . with respect to any person

is liable to such person . . . .").  "The regulations interpreting and implementing the TILA are

known as 'Regulation Z.'"  *Aleman v. Ellington Auto Sales & Fin., LLC*, 2012 WL 3611212, at

*3 (D. Conn. Aug. 21, 2012); *see also* 12 C.F.R. § 226.

The TILA requires creditors[13] to "disclose . . . [t]he 'finance charge,' not itemized, using

that term."  15 U.S.C. § 1638(a)(3).  Any "'finance charge' shall be disclosed more

conspicuously than other terms, data, or information provided in connection with a transaction,

except information relating to the identity of the creditor."  15 U.S.C. § 1632(a).  A "finance

charge" is "the cost of consumer credit as a dollar amount," and it "includes any charge payable

directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an

incident to or a condition of the extension of credit."  12 C.F.R. § 226.4(a).  A "finance charge"

does "not include any charge of a type payable in a comparable cash transaction."  *Id.*  And a

---

[13]     Under the TILA, a "creditor" is a "person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract."  12 C.F.R. § 226.2(a)(17)(i).  (Five Star is a "person" within the meaning of the TILA because it is a limited liability company.  *See* 12 C.F.R. § 226.2(a)(22).)  "A person regularly extends consumer credit only if it extended credit . . . more than 25 times . . . in the preceding calendar year."  12 C.F.R. § 226.2(a)(17)(v).  Cartagena-Cordero alleges that "Five Star regularly extended [credit] to car purchasers and entered into such transactions at least 25 times in the calendar year preceding the sale to Plaintiff."  Compl., Doc. No. 1, at ¶ 54.  Thus, Cartagena-Cordero has established that Five Star is a "creditor" within the meaning of the TILA.

"cash price" is "the price at which a creditor, in the ordinary course of business, offers to sell for cash property or service that is the subject of the transaction."  12 C.F.R. § 226.2(a)(9).  The term "cash price" "does not include any finance charge."  *Id.*

Cartagena-Cordero claims that Five Star violated the TILA in two ways.  First, Cartagena-Cordero claims that Five Star violated the TILA by "burying" the $501 finance charge within the $16,500 "cash price" of the Truck.  *See* Pl.'s Mem. of Law in Supp. Third Renewed Mot. for J. ("Pl.'s Mem. of Law"), Doc. No. 26-1, at 10.  Indeed, the Supreme Court has explained that one purpose of the TILA and its implementing regulations was to disallow that very practice.  *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 368–69 (1973) (explaining that regulation targeted "the practice of burying the finance charge in the cash price" because allowing that practice to continue "would have been directly contrary to Congressional intent") (cleaned up).  Here, Cartagena-Cordero explains that a finance charge of $501 was "buried" in the Truck's cash price of $16,500.  *See* Pl.'s Mem. of Law, Doc. No. 26-1, at 10.  Cartagena-Cordero asserts that Five Star "increased the purchase price, because it planned to assign the retail installment sales contract to a discount finance company that would charge [a] fee or otherwise delay compensation in consideration of accepting the contract."  Compl., Doc. No. 1, at ¶ 17; *see also* Pl.'s Mem. of Law, Doc. No. 26-1, at 10 ("[T]his increase was on account of utilizing Westlake as the finance company and the fees it charges to the dealership when taking assignment of a retail installment sales contract.").  Thus, Cartagena-Cordero claims, the $501 charge was "incident to the extension of credit" and so was a "finance charge" that should have been broken out and itemized as such, rather than buried into the Truck's cash price.  *See* Compl., Doc. No. 1, at ¶ 56.

Cartagena-Cordero also claims that Five Star violated the TILA because Five Star "failed to give Plaintiff a copy of the TILA disclosures in a form he could keep: it did not give Plaintiff a copy of the retail installment sales contract at all."  Pl.'s Mem. of Law, Doc. No. 26-1, at 11; *see also* Compl., Doc. No. 1, at ¶¶ 55, 57.  According to Cartagena-Cordero, that conduct violated 12 C.F.R. § 226.17(a) and (b), which provide that a "creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep," and must do so "before consummation of the transaction."

I agree with Cartagena-Cordero that Five Star violated the TILA in the two ways he describes.  Regarding the $501 finance charge, Cartagena-Cordero alleges that the negotiated cash price of the Truck was $15,999.  Cartagena-Cordero further alleges that Five Star then increased the cash price to $16,500.  Cartagena-Cordero alleges that Five Star increased the price by $501 to cover the cost of having Westlake service the retail installment sales contract.  However, Cartagena-Cordero alleges, Five Star buried that $501 in the Truck's cash price.  Thus, I agree with Cartagena-Cordero that the $501 finance charge violated the TILA.  I also agree with Cartagena-Cordero that Five Star's failure to give Cartagena-Cordero a copy of the retail sales installment contract violated the TILA and Regulation Z.

b.   Federal Odometer Act

Congress's purpose in enacting the FOA was to (1) "prohibit tampering with motor vehicle odometers," and (2) "provide safeguards to protect purchasers in the sale of motor vehicles with altered or reset odometers."  49 U.S.C. § 32701(b).  The FOA "imposes on car dealers various requirements intended to ensure that automobile consumers are provided with accurate statements of a car's mileage."  *Locascio v. Imports Unlimited, Inc.*, 309 F. Supp. 2d 267, 270 (D. Conn. 2004) (citing 49 U.S.C. § 32705).  "[A] person transferring ownership of a

motor vehicle shall" make a written disclosure to the transferee stating "the cumulative mileage

registered on the odometer," if known.  49 U.S.C. § 32705(a)(1)(A), (a)(2); *see also* 49 C.F.R. §

580.5 (further elucidating disclosure requirements).[14]  "A person may bring a civil action to

enforce a claim" under the FOA, and whoever violates the FOA "or a regulation prescribed or

order issued under this chapter, with intent to defraud, is liable for 3 times the actual damages or

$10,000, whichever is greater."  49 U.S.C. § 32710.  "In order for a civil plaintiff to recover

damages under the Odometer Act, she must prove (a) a violation of the act, (b) made with intent

to defraud."  *Locacsio*, 309 F. Supp. 2d at 270.

     In my view, Cartagena-Cordero has established a claim for an FOA violation, but not on

the theory that he puts forward.  First, I explain why I disagree with Cartagena-Cordero's theory.

Then, I explain why Cartagena-Cordero has still established an FOA claim.

     Cartagena-Cordero claims not that Five Star lied *to him* about the Truck's mileage, but

rather that Five Star lied "to the finance company, Westlake, and the service contract

administrator," A.U.L. Corporation.  Pl.'s Mem. of Law, Doc. No. 26-1, at 13; Service Contract,

Ex. 3a to Aff. of Cartagena-Cordero, Doc. No. 26-4, at 25; Forged Contract, Ex. 2 to Aff. of E.

Cartagena-Cordero, Doc. No. 26-4, at 17.  More precisely, Cartagena-Cordero alleges that Five

Star "knew that Plaintiff would be seeking warranty work soon after purchase," and so, "[t]o

hedge its bets, it rendered the Vehicle service contract-eligible from the time of sale" by "falsely

stat[ing] a lower mileage at the time of sale" to the service contract administrator, which then

---

[14]    Under the FOA's implementing regulation, a transferor will disclose a vehicle's mileage on a physical or
electronic title, where available, and on "a separate physical document" when a title is unavailable.  49 C.F.R. §
580.5(a), (g).  In my view, those requirements do not limit a transferor's liability under the FOA to lies regarding
mileage made on those types of documents.  First, the FOA itself references only a "written disclosure."  *See* 49
U.S.C. § 32705(a).  Second, the purpose of the FOA is broad and remedial, and limiting it in that way would be
unnecessarily narrow.  And, third, other courts have held transferors liable for FOA violations where the
misstatement at issue apparently occurred on a purchase order (as in this case).  *See Terry v. Whitlock*, 102 F. Supp.
2d 661, 663 (W.D. Va. 2000) (granting buyer summary judgment on FOA claim when seller misrepresented
vehicle's mileage on "Buyer's Order").

"relied upon Five Star's false representation, because it authorized the engine repairs under the service contract."  Pl.'s Mem. of Law, Doc. No. 26-1, at 13.

Cartagena-Cordero claims that "a transferee has standing to assert claims for Odometer Act violations even if the fraudulent statements are made to a third party."  *Id.* at 12.  In support of that claim, Cartagena-Cordero cites *Nigh v. Koons Buick Pontiac GMC, Inc.*, 143 F. Supp. 2d 563, 566 (E.D. Va. 2001).[15]  In *Nigh*, an automobile dealership correctly disclosed a vehicle's odometer reading to the vehicle's purchaser but lied about the vehicle's odometer reading on a form that it submitted to the Virginia DMV.  *Id.* at 565–66.  The court held that the purchaser could not bring an action on his own behalf because there was no evidence that the automobile dealership had intended to defraud him.  *Id.* at 566.  However, the court held that the purchaser could bring a civil action on behalf of the DMV because "the FOA's language does not state that a violation be committed with intent to defraud *the purchaser* of an automobile."  *Id.* (citing 49 U.S.C. § 32710).  Thus, the *Nigh* Court held, "it is appropriate for Nigh to maintain a private cause of action for Koons' alleged FOA violations and defrauding of the DMV."  *Id.*  Cartagena-Cordero argues that the *Nigh* Court's holding applies equally as well here because "*Nigh* contains no limiting language indicating that the statement must involve a government agency."  Pl.'s Mem. of Law, Doc. No. 26-1, at 12.

I do not agree with the *Nigh* Court's statutory analysis.[16]  Recall that the FOA provides for the following private, civil causes of action:

---

[15]     Cartagena-Cordero does not cite, and I am not aware of, any further cases supporting Cartagena-Cordero's reading of the FOA.  *Cf.* Barbara J. Van Arsdale, et al., *Odometers—Civil actions by private persons*, 7A Am. Jur. 2d Automobiles § 198 (citing only *Nigh* for the proposition that the FOA's civil cause of action extends to enforcing an FOA violation against a third party).

[16]     I am aware that the Fourth Circuit affirmed the *Nigh* Court's rulings, *see Nigh v. Koons Buick Pontiac GMC, Inc.*, 319 F.3d 119, 129 (4th Cir. 2003), and that the Supreme Court reversed on different grounds, *see Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 64 (2004).  However, neither the Fourth Circuit nor the Supreme Court discussed at all the *Nigh* Court's holding regarding the FOA.  Instead, both courts focused on a separate

> **(a)  Violation and amount of damages**.--A person that violates this chapter or a regulation prescribed under this chapter, with intent to defraud, is liable for 3 times the actual damages or $10,000, whichever is greater.
>
> **(b) Civil actions**.--A person may bring a civil action to enforce a claim under this section in an appropriate United States district court or in another court of competent jurisdiction.  The action must be brought not later than 2 years after the claim accrues.  The court shall award costs and a reasonable attorney's fee to the person when a judgment is entered for that person.

49 U.S.C. § 32710.  The *Nigh* Court focused on the fact that the above language "does not state that a violation be committed with intent to defraud *the purchaser* of an automobile."  *Nigh*, 143 F. Supp. 2d at 566.  However, a prerequisite for reaching the "intent to defraud" question is a "violat[ion] [of] this chapter or a regulation prescribed or order issued under this chapter."  49 U.S.C. § 32710(a).  In my view, no such violation occurred in *Nigh*, and no such violation occurred in this case (based on Cartagena-Cordero's third-party theory).  That is because the relevant disclosure requirements that the FOA imposes on transferors are limited to the transferee.  *See, e.g.*, 49 U.S.C. § 32705(a)(1) ("[A] person transferring ownership of a motor vehicle shall give the transferee the following written disclosure."); *id.* at § 32705(a)(2) ("A person transferring ownership of a motor vehicle may not violate a regulation prescribed under this section or give a false statement to the transferee in making the disclosure required by such a regulation."); 49 C.F.R. § 580.5 (describing disclosure obligations of transferor to transferee).  Because Cartagena-Cordero was the "transferee," Five Star's disclosure obligations pursuant to the FOA appear to run exclusively to him.  Thus, Cartagena-Cordero does not adequately explain why Five Star's intending to defraud Westlake and the service contract administrator with respect to the Truck's odometer reading violated the FOA or the regulations promulgated thereunder.  At the least, I will not grant Cartagena-Cordero's motion for default judgment on

---

question pertaining to the TILA.  In my view, it is not clear whether the *Nigh* Court's holding regarding the FOA was a subject of appeal.

that theory because it appears that Five Star may have a meritorious defense.  *See Atl. Recording Corp.*, 534 F. Supp. 2d at 280.

However, Cartagena-Cordero overlooks a simpler theory that does establish an FOA violation.  Five Star *did* lie to Cartagena-Cordero about the Truck's mileage, and Five Star also intended to defraud Cartagena-Cordero.  When he visited Five Star on December 6, 2018, Cartagena-Cordero "executed a purchase order."  Compl., Doc. No. 1, at ¶ 15; Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶ 11.  That initial purchase order indicated, incorrectly, that the Truck's mileage was 110,659.  *See* Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶ 23. The Truck's actual mileage was 112,820; that reality was reflected in a second purchase order that Cartagena-Cordero executed on December 11, 2018.  *See id.* at ¶¶ 23, 35.  Cartagena-Cordero alleges that Five Star decreased the mileage in the first purchase order because "it wanted the service contract that it had surreptitiously added to the Forged Contract to be in effect if Plaintiff brought the Vehicle back for repairs."  Compl., Doc. No. 1, at ¶ 30.

Cartagena-Cordero's allegation is backed up by other evidence in the record.  For instance, Cartagena-Cordero submitted a photograph of "a document that Five Star told me was the service contract"; that document reports the Truck's mileage as 110,659.  Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶ 34; Service Contract, Ex. 3a to Aff. of Cartagena-Cordero, Doc. No. 26-4, at 25.  Further, Five Star's behavior supports the inference that Five Star altered the Truck's odometer reading to avoid having to repair the Truck at its own cost.  For instance, Cartagena-Cordero alleges that AJ Sakr knew the Truck's head gasket was defective before selling the Truck to Cartagena-Cordero.  *See* Compl., Doc. No. 1, at ¶ 36.  Even so, when Cartagena-Cordero attempted to bring in the Truck for repairs that Five Star admitted were necessary, "Five Star told Plaintiff that he must wait at least a week . . . , which would be at least

30 days after purchase, presumably so that it would be able to make a claim on his service contract." *Id.* at ¶ 38.  Cartagena-Cordero alleges that Five Star's subsequent repairs—which were inadequate anyway—were thus covered under the service contract rather than undertaken as warranty work.  *Id.* at ¶ 40.  Given all that, I infer from Cartagena-Cordero's allegations that Five Star intentionally lied to Cartagena-Cordero about the Truck's mileage in the first purchase order with the intent of making him, even if indirectly,[17] bear some of the cost for the repairs. Thus, Cartagena-Cordero has established a claim for a violation of the FOA.

c.   CUTPA

Under CUTPA, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  "In general, there are two methods a court uses for determining whether a practice violates CUTPA."  *Locascio*, 309 F. Supp. 2d at 271.  "First, and simplest, the Commissioner of Consumer Protection sets forth certain regulations a violation of which is a *per se* violation of CUTPA."  *Id.* (citing Conn. Gen. Stat. § 42-110b(c) (empowering the commissioner to "establish by regulation acts, practices or methods which shall be deemed to be unfair or deceptive"); Conn. Agencies Regs. § 42-110b-28).  "Second, if no regulation covers the practice in question, the court applies the so-called 'cigarette rule' to determine if a given practice violates CUTPA." *Id.*  Under that rule, a court considers:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons.  All three criteria do not

---

[17]   Even if the service contract administrator covered the cost of the repairs, Cartagena-Cordero still paid for the service contract, which he might not have done otherwise.  Indeed, the $995 charge for the service contract was included in the Forged Contract; Cartagena-Cordero was "unaware of this charge and had not agreed to it."  Compl., Doc. No. 1, at ¶ 23.

need to be satisfied to support a finding of unfairness.  A practice may be unfair
because of the degree to which it meets one of the criteria or because to a lesser
extent it meets all three.

*Edmands v. CUNO, Inc.*, 277 Conn. 425, 450 n.16 (2006) (cleaned up).

Cartagena-Cordero has established that Five Star violated CUTPA because Five Star

violated several Connecticut regulations the violations of which amount to *per se* violations of

CUTPA.  First, it is a *per se* violation of CUTPA for car dealers to sell vehicles for more than

their advertised price.  *See* Conn. Agencies Regs. § 42-110b-28(b)(1) ("It shall be an unfair or

deceptive act or practice for a . . . used car dealer to fail to sell . . . a motor vehicle in accordance

with any terms or conditions which the dealer has advertised, including, but not limited to, the

advertised price."); *see also Emmanuelli v. Merriam Motors, Inc.*, 2003 WL 22080496, at \*2

(Conn. Super. Ct. Aug. 25, 2003) ("A violation of the cited state regulation [Conn. Agencies

Regs. § 42-110b-28(b)(1)], by its very wording, would be a per se violation of CUTPA.").  An

"advertisement" is "any oral, written or graphic statement made by a new car dealer or used car

dealer in any manner in connection with the solicitation of business."  Conn. Agencies Regs. §

42-110b-28(a)(3).  As already described, a representative of Five Star orally told Cartagena-

Cordero that the Truck's price was $15,999.  However, Five Star ultimately increased the

Truck's price to $16,500.  Five Star thus violated CUTPA by selling the Truck to Cartagena-

Cordero for more than its advertised price.

Second, it is a *per se* violation of CUTPA for a "used car dealer to violate any provision

of a federal or state statute or regulation concerning the sale or lease of motor vehicles."  Conn.

Agencies Regs. § 42-110b-28(b)(23).  Cartagena-Cordero argues that Five Star violated

Connecticut law in several ways.  The first regards a non-disclosed dealer conveyance fee.  In

Connecticut, a licensed dealer advertising the price of a motor vehicle must "state in at least

eight-point bold type that any state or local tax, registration fees or *dealer conveyance fee* or

processing fee . . . is excluded from such advertised price" and "separately state, in at least eight-

point bold type, immediately next to the phrase 'Dealer Conveyance Fee,' the amount of such

dealer conveyance fee or processing fee." Conn. Gen. Stat. § 14-62a(a) (emphasis added).

Further, "[t]he selling price quoted by any dealer to a prospective buyer shall include, separately

stated, the amount of the dealer conveyance fee and that such fee is negotiable. No dealer

conveyance fee shall be added to the selling price at the time the order is signed by the buyer."

Conn. Gen. Stat. § 14-62(b)(1). Cartagena-Cordero notes that he was never told about the $699

dealer conveyance fee and that he was never presented with a document that itemized that

charge. (Indeed, Cartagena-Cordero alleges that the entire retail installment sales contract was

forged.) I agree with Cartagena-Cordero that Five Star's deception with respect to the dealer

conveyance fee was a *per se* violation of CUTPA.

Cartagena-Cordero also alleges that Five Star violated Connecticut law by failing to

provide him with the necessary safety inspection paperwork. Under Connecticut law, "[b]efore

offering any used motor vehicle for retail sale, the selling dealer shall complete a comprehensive

safety inspection of such vehicle," which "shall be evidenced on a form approved by the

commissioner." Conn. Gen. Stat. § 14-62(g). That form is a Form K-208. *See* Form K-208,

State of Conn., https://portal.ct.gov/-/media/DMV/20/29/K208pdf.pdf?la=en (last visited Oct. 6,

2020) (noting that "[t]his report shall be used by a CT licensed dealer to comply with CGS 14-

62(g) and must be completed in its **ENTIRETY**."). Cartagena-Cordero alleges that Five Star did

not provide him with a Form K-208. *See* Compl., Doc. No. 1, at ¶ 80(c). Cartagena-Cordero

claims that that failure was a *per se* violation of CUTPA, and I agree.

Finally, Cartagena-Cordero alleges that Five Star violated CUTPA in the following ways, which do not amount to *per se* violations:

- Five Star "deceptive[ly] sold the Vehicle with a defective engine";

- Five Star "added a service contract to the Forged Contract in order to perform warranty work on the known defect without incurring any out of pocket costs";

- Five Star "forged Plaintiff's digital signature on to the Forged Contract";

- Five Star violated the TILA; and

- Five Star violated the FOA.

Compl., Doc. No. 1, at ¶ 80.  As a result, Cartagena-Cordero claims that he "suffered an ascertainable loss of money or property in the form of [1] an increased purchase price, [2] increased sales tax, [3] increased finance charges, [4] increased payments, . . . [5] the costs associated with the Vehicle's defects, [6] the cost of the dealer's conveyance fee, and [7] the service contract."  *Id.* at ¶ 81.  I agree with Cartagena-Cordero that Five Star's selling him a defective vehicle, surreptitiously adding a service contract to the purchase, and forging his signature are all "unfair" and "deceptive" conduct that amount to a violation of CUTPA.  Put simply, Cartagena-Cordero's allegations detail a blatant scheme to sell Cartagena-Cordero a lemon and then make him (directly or indirectly) pay for the Truck's inevitable, imminent, and necessary repairs.  For those reasons, Cartagena-Cordero has established a CUTPA violation.

        d.   Implied Warranty of Merchantability

In Connecticut, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Conn. Gen. Stat. § 42a-2-314(1).  Merchantable goods must be "fit for the ordinary purposes for which such goods are used" and "conform to the promises or affirmations of fact made on the container or label."  Conn. Gen. Stat. § 42a-2-314(2).  Put simply, "[u]nder Connecticut law, a product must be fit for

the ordinary purpose for which such goods are used."  *K.E. v. GlaxoSmithKline LLC*, 2017 WL

440242, at *22 (D. Conn. Feb. 1, 2017) (cleaned up).

> [T]o state a claim for breach of the implied warranty of merchantability, a party must plead that: 1) a merchant sold the goods; 2) the goods were defective and not merchantable at the time of sale; 3) injury occurred to the buyer or his property; 4) the injury was caused by the merchant's defective product; and 5) notice was given to the seller of the claimed breach.

*Gallinari v. Kloth*, 148 F. Supp. 3d 202, 215 (D. Conn. 2015) (quoting *State v. McGriff,* 1991

WL 257221, at *2 (Conn. Super. Ct. Nov. 27, 1991)).  "A car dealership is a 'merchant' under

Conn. Gen. Stat. § 42a-2-314, and a car's ordinary purpose is normal and reliable driving."

*Hernandez*, 2020 WL 2543785, at *9 (cleaned up); *see also* Conn. Gen. Stat. § 42a-2-104

(defining "merchant").  Although the implied warranty of merchantability can be waived when a

product is sold "as is," *see* Conn. Gen. Stat. § 42a-2-316(3)(a), the Truck was not sold "as is."

*See* Pl.'s Mem. of Law, Doc. No. 26-1, at 14; Second Purchase Order, Ex. 3 to Aff. of E.

Cartagena-Cordero, Doc. No. 26-4, at 22 ("As is" warranty section not executed).

Cartagena-Cordero alleges that Five Star breached the implied warranty of

merchantability:  The Truck was "not in merchantable condition at the time of sale" because "the

engine was defective and the Vehicle had defective front left, upper and lower ball joints, worn

out pads and rotors in the front brakes and blown front and rear shocks."  Compl., Doc. No. 1, at

¶ 67.  Further, Cartagena-Cordero alleges that "Five Star knew of the engine defect at the time it

sold the Vehicle to [Cartagena-Cordero] and failed to disclose the defect or repair it."  *Id.* at ¶ 68.

When Cartagena-Cordero brought the Truck back to Five Star, Cartagena-Cordero gave Five

Star "a reasonable opportunity to cure the breach with respect to the engine by allowing them to

attempt repairs," but Five Star "failed to address the problems."  *Id.* at ¶ 70; Pl.'s Mem. of Law,

Doc. No. 26-1, at 14.  Those facts indicate that Cartagena-Cordero has alleged a breach of the

implied warranty of merchantability.

> e.  Civil Forgery

"Any person who falsely makes, alters, forges or counterfeits any document, or

knowingly utters, as true, any document falsely made, altered, forged or counterfeited, shall pay

double damages to any party injured thereby."  Conn. Gen. Stat. § 52-565.  Civil forgery is "a

species of fraud."  *Criscuolo v. Shaheen*, 736 A.2d 947, 952 (Conn. Super. Ct. 1999).  Taking

Cartagena-Cordero's well-pled allegations as true, as I must, he has established that Five Star

committed civil forgery by affixing his electronic signature to the retail installment sales

contract.  *See* Compl., Doc. No. 1, at ¶¶ 18–23; 87–88; Forged Contract, Ex. 2 to Aff. of E.

Cartagena-Cordero, Doc. No. 26-4, at 17–18.

> B.  <u>Damages</u>

> > a.  TILA

Under the TILA, "any creditor who fails to comply with any requirement imposed under

this part . . . is liable" for "any actual damage sustained by such person as a result of the failure."

15 U.S.C. § 1640(a)(1).  In an individual action, the creditor will be liable for "twice the amount

of any finance charge in connection with the transaction."  *Id.* § 1640(a)(2)(A)(i).  Depending on

the type of individual action, a statutory cap on damages might apply.  Cartagena-Cordero claims

that he "is entitled to recover actual damages and statutory damages of double the finance charge

of $7,079.08 pursuant to 15 U.S.C. § 1638(a)(2)(A)(ii)[18] capped at $2,000."  Pl.'s Mem. of Law,

Doc. No. 26-1, at 11.[19]  Thus, Cartagena-Cordero seeks to recover statutory damages of $2,000.

---

[18]   The $2,000 statutory cap to which Cartagena-Cordero refers is not contained in 15 U.S.C. §
1638(a)(2)(A)(ii) but, rather, 15 U.S.C. § 1640(a)(2)(A)(ii).
[19]   Although it is a moot point, Cartagena-Cordero may not be correct in asserting that his statutory damages
cap is $2,000.  According to the TILA, a $2,000 statutory cap on damages applies to "an individual action relating to

*See id.* at 26.  Cartagena-Cordero's assessment is off the mark.  The finance charge at issue amounts to $501, not $7,079.08.  Indeed, it is entirely unclear from where Cartagena-Cordero produces the $7,079.08 figure.  Cartagena-Cordero does not allege any "actual damages" he suffered as a result of Five Star's TILA violation beyond the concealed finance charge.  Thus, I hold that, for Five Star's violation of the TILA, Cartagena-Cordero is entitled to "twice the amount of any finance charge in connection with the transaction," which is $1,002.

      b.  FOA

"A person that violates" the FOA "with intent to defraud . . . is liable for 3 times the actual damages or $10,000, whichever is greater."  49 U.S.C. § 32710(a).  As Cartagena-Cordero acknowledges, $10,000 is greater than three times his actual damages that arise from Five Star's FOA violation.  *See* Pl.'s Mem. of Law, Doc. No. 26-1, at 26.  I hold that Cartagena-Cordero is entitled to statutory damages of $10,000 for Five Star's violation of the FOA.

      c.  Actual damages

Cartagena-Cordero seeks to recover his actual damages pursuant to Five Star's violations of CUTPA, its breach of the implied warranty of merchantability, and its civil forgery.  Cartagena-Cordero states that his actual damages sum to $13,106.02.  *See* Pl.'s Mem. of Law, Doc. No. 26-1, at 26.  Cartagena arrives at that sum as follows:

| | | |
|---|---|---|
| (1) Repairs to Vehicle | = | $7,738.99 |
| (2) Cost of Inspection | = | $154.21 |
| (3) DMV Fine | = | $20.00 |
| (4) Service Contract | = | $995.00 |

a consumer lease." 15 U.S.C. § 1640(a)(2)(A)(ii).  But no consumer lease is at issue in this case.  In any event, $2,000 is the lowest statutory cap on damages in the TILA, and, as I explain, the amount of actual damages to which Cartagena-Cordero is entitled falls below that statutory cap.  Thus, any discrepancy or inaccuracy is moot.

| | | |
|---|---|---|
| (5)  Dealer Conveyance Fee | = | $699.00 |
| (6)  Finance Charge | = | $501.00 |
| (7)  Sales Tax on Service Contract and Finance Charge | = | $95.00 |
| (8)  Interest Charge | = | $2,902.82 |

Cartagena-Cordero has not submitted facts sufficient to establish items (1), (3), and (8), and so he is not entitled to those actual damages.  More specifically, the only documentary support for Cartagena-Cordero's request for $7,738.99 for repairs to the Truck comes from his affidavit.  *See* Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at ¶ 56.  The same goes for Cartagena-Cordero's request for $20 for a DMV emissions fine.  *See id.* at ¶ 43.  "A court may not just accept a plaintiff's statement of the damages, even in a default judgment."  *Hernandez*, 2020 WL 2543785, at *6 (citing *Karmacharya*, 2017 WL 5515951, at *2; *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp. Div. of Ace Young, Inc.*, 109 F.3d 105, 111 (2d Cir. 1997)) (cleaned up).  Awarding Cartagena-Cordero $7,738.99 for repairs and $20 for an emissions fine would require me simply to accept Cartagena-Cordero's statement of the damages, and so I will not award them.  However, because Cartagena-Cordero might have documentation to support those claimed damages (such as receipts of payment), I will allow him to submit such documentation—if he has it—in a supplemental affidavit at the same time as he submits a claim for attorneys' fees.

Similarly, Cartagena-Cordero has not submitted any facts to support his request for a $2,902.82 "interest charge."  Indeed, Cartagena-Cordero provides no details whatsoever regarding that "interest charge."  The face of the Forged Contract does not explain the interest charge.  In fact, it seems that Cartagena-Cordero may have mistakenly attributed that interest charge to Five Star:  In a footnote regarding the $2,902.82 interest charge request, Cartagena-

Cordero notes that that sum regards "Westlake only." *See* Pl.'s Mem. of Law, Doc. No. 26-1, at

26 n.91. For those reasons, I will not award Cartagena-Cordero the $2,902.82 "interest charge"

as actual damages.

In contrast, Cartagena-Cordero has established that he is entitled to the following actual

damages: $154.21 as a cost of inspection,[20] $995 for the unwitting purchase of the service

contract,[21] $699 for the concealed dealer conveyance fee,[22] $501 for the deceptive finance charge

built into the Truck's price,[23] and $31.81 for Connecticut sales tax on the $501 deceptive finance

charge.[24] However, Cartagena-Cordero has already recovered on the $501 finance charge

subject to his TILA claim. Thus, in total, Cartagena-Cordero is entitled to $1,880.02 in actual

damages on his claims for violations of CUTPA, breach of the implied warranty of

merchantability, and civil forgery.

        d.   Punitive Damages and Civil Theft Double Damages

Pursuant to Connecticut's civil forgery statute, "[a]ny person who falsely makes, alters,

forges or counterfeits any document, or knowingly utters, as true, any document falsely made,

altered, forged or counterfeited, shall pay double damages to any party injured thereby."  Conn.

Gen. Stat. § 52-565. As described above, the fraudulent execution of the Forged Contract caused

---

[20]      *See* Ford Quote, Ex. 4 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 34 (cost of inspection $154.21).
[21]      *See* Forged Contract, Ex. 2 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 17–18 (noting the $995
service contract); Service Contract, Ex. 3a to Aff. of Cartagena-Cordero, Doc. No. 26-4, at 25 (displaying the
"single payment contract price" as $995).
[22]      *See* Forged Contract, Ex. 2 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 17 (noting the $699.00
charge to "Five Star Cars LLC for Doc Fee"); Second Purchase Order, Ex. 3 to Aff. of E. Cartagena-Cordero, Doc.
No. 26-4, at 23 (itemizing $699 as a "Dealer Processing Fee").
[23]      *See* Forged Contract, Ex. 2 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at 17 (listing Price of Vehicle
as $17,655.32 with $1,155.32 due to sales tax); Second Purchase Order, Ex. 3 to Aff. of E. Cartagena-Cordero, Doc.
No. 26-4, at 23 (describing "Cash Price" as "16500").
[24]      Although Cartagena-Cordero seeks sales tax on both the service contract and the $501 finance charge, I can
award him sales tax on only the $501 finance charge because Cartagena-Cordero submits documentary evidence
regarding only that sales tax.  *See* Second Purchase Order, Ex. 3 to Aff. of E. Cartagena-Cordero, Doc. No. 26-4, at
23 (itemizing sales tax (at 6.35%) charge on Truck's cash price of 16,500).  Thus, Cartagena-Cordero is entitled to
$31.81 ($501 multiplied by .0635, rounded down).

Cartagena-Cordero injury in the amount of $1,880.02 (the cost of inspection, which was not strictly included in the contract, was a harm that nonetheless flowed from the Forged Contract's execution).[25]  Thus, Cartagena-Cordero is entitled to double those damages, or another $1,880.02.

Similarly, Cartagena-Cordero seeks punitive damages for Five Star's CUTPA violations. As redress for a CUTPA violation, "[t]he court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper."  Conn. Gen. Stat. § 42-110g(a).  Whether to award punitive damages under CUTPA is a matter within the court's discretion.  *Tang v. Bou-Fakhreddine*, 75 Conn. App. 334, 339 (2003).  Such punitive damages, unlike common law punitive damages which are available following a breach of the implied warranty of merchantability, are not limited to attorneys' fees and costs.  *See Assoc. Inv. Co. Ltd. P'ship v. Williams Assocs. IV*, 230 Conn. 148, 160 (1994).  "Punitive damages are appropriate when a violator was recklessly indifferent, intentional and wanton, malicious, violent, or motivated by evil."  *Locascio*, 309 F. Supp. 2d at 273 (citing *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1040 (2d Cir. 1992)).  CUTPA "does not dictate a method for calculating punitive damages."  *Alexis v. PMM Enters. LLC*, 2018 WL 5456491, at *6 (D. Conn. Oct. 29, 2018).  But the purpose of such awards is to help "create a climate in which private litigants help to enforce the ban on unfair or deceptive trade practices or acts."  *Williams Assocs. IV*, 230 Conn. at 160.  "Courts often achieve this goal by tethering punitive damages to the actual damages in a case, imposing a multiplier as necessary to deter future misconduct."  *Alexis*, 2018

---

[25]     At the least, the $154.21 cost of inspection was incidental damage resulting from Five Star's breach of the implied warranty of merchantability.  Such a cost is recoverable.  *See Hernandez*, 2020 WL 2543785, at *15 ("Consumers may also recover incidental and consequential damages for a seller's breach of the implied warranty of merchantability.").  Incidental damages "include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."  Conn. Gen. Stat. § 42a-2-715(1).

WL 5456491, at *6 (citing *Bridgeport Harbour Place I, LLC v. Ganim*, 131 Conn. App. 99, 145 (2011)). Often, courts decline to award punitive damages under CUTPA when a plaintiff has already recovered treble statutory damages on other claims. *See, e.g.*, *Voll v. Dunn*, 2014 WL 7461644, at *12 (Conn. Super. Ct. Nov. 10, 2014); *Torres v. Kershner Co.*, 2010 WL 5573744, at *18 (Conn. Super. Ct. Dec. 13, 2010); Mem. of Decision, Doc. No. 25, at 13–14, *Ascent Roofing Sols., LLC v. Atl. Motors LLC, et al.*, No. 3:17-cv-634 (VLB).

In this case, Cartagena-Cordero seeks a 2x multiplier of actual damages because such a multiplier would "have a deterrent effect against others engaging in similar future conduct." Pl.'s Mem. of Law, Doc. No. 26-1, at 21. In Cartagena-Cordero's view, that 2x multiplier contemplates punitive damages of $25,000. *See id.* at 26. However, as I have already explained, Cartagena-Cordero is entitled to $1,880.02 in actual damages, and so doubling that amount would yield $3,760.04. In any event, I decline to award Cartagena-Cordero punitive damages under CUTPA because Cartagena-Cordero has already recovered statutory double damages on two other claims (TILA and civil forgery). Cartagena-Cordero has also recovered $10,000 as a statutory award for a violation of the FOA in which he sustained actual harm amounting to much less than that. The facts underlying Cartagena-Cordero's TILA, civil forgery, and FOA claims are the same ones underlying his CUTPA claim. *Cf. Parris v. Pappas*, 844 F. Supp. 2d 271, 285 (D. Conn. 2012) (declining to award punitive damages on CUTPA claim when plaintiff's "recovery theory and the facts she relies on are coextensive with the compensatory damages already awarded for the [Fair Housing Act] violation," so "[a]n additional punitive damages award under CUTPA will amount to a double recovery"). For those reasons, I decline to award Cartagena-Cordero punitive damages on his CUTPA claim.

e.   Attorneys' Fees and Costs

Cartagena-Cordero seeks to recover reasonable attorneys' fees and costs under the TILA, the FOA, CUTPA, and for Five Star's breach of the implied warranty of merchantability.  *See* Pl.'s Mem. of Law, Doc. No. 26-1, at 21–25.  Pursuant to the TILA, in any "successful action," the prevailing party is entitled to "the costs of the action, together with a reasonable attorney's fee as determined by the court."  15 U.S.C. § 1640(a)(3); *see also James v. Lopez Motors, LLC*, 2018 WL 1582552, at *4 (D. Conn. Mar. 31, 2018) ("Violators of TILA are also liable for reasonable attorney's fees and costs.").  Pursuant to the FOA, when judgment is entered for a plaintiff, "[t]he court shall award costs and a reasonable attorney's fee to the person."  49 U.S.C. § 32710(b).  When a plaintiff establishes a breach of the implied warranty of merchantability, that plaintiff also may recover reasonable attorneys' fees and costs pursuant to either the Magnuson-Moss Warranty Act (the "MMWA"), 15 U.S.C. § 2310(d), or as common law punitive damages.  The MMWA "allows a plaintiff who is successful on a state-law breach of warranty claim to recover attorneys' fees and costs."  *Alexis*, 2018 WL 5456491, at *5 (citing 15 U.S.C. § 2310(d)(2)).  Alternatively, punitive damages are available under Connecticut law for a claim of breach of warranty "if plaintiff alleges conduct that is done with a bad motive or with a reckless indifference to the interests of others."  *Id.* (quoting *Makuch v. Stephen Pontiac-Cadillac, Inc.*, 2013 WL 45887, at *2 (D. Conn. Jan. 3, 2013)) (cleaned up).  But such common law punitive damages "cannot exceed the plaintiff's expenses of litigation, less his taxable costs."  *Id.* (quoting *Berry v. Loiseau*, 223 Conn. 786, 832 (1992)).  Finally, pursuant to CUTPA, a "court may award . . . costs and reasonable attorneys' fees."  Conn. Gen. Stat. § 42-110g(d).

I will thus award Cartagena-Cordero reasonable attorneys' fees and costs.  I will consider the proper amount of those awards when Cartagena-Cordero's attorney submits a fee claim

following entry of this Order.  Cartagena-Cordero's attorney may submit that fee claim within fourteen (14) days from the entry of judgment.  *See* Fed. R. Civ. P. 54(d).

### IV.    Conclusion

For the foregoing reasons, I **grant in part and deny in part** Cartagena-Cordero's motion for a default judgment, doc. no. 26.  The Clerk is directed to enter judgment for Cartagena-Cordero and against Five Star in the total amount of $14,762.04.  The breakdown of those damages is summarized in the following table.  Cartagena-Cordero may make a motion for attorneys' fees and costs within 14 days from the entry of judgment.  Cartagena-Cordero also may, by the same date, submit a supplemental affidavit with documentation regarding the costs he has incurred in (1) repairing the Truck and (2) paying the relevant DMV fine.  Cartagena-Cordero may also recover post-judgment interest as provided by law.

The Clerk is directed to enter judgment and close this file.

| Claim | Recovery |
|---|---|
| TILA Double Damages | $1,002 |
| FOA Statutory Damages | $10,000 |
| Actual Damages | $1,880.02 |
| Civil Forgery Double Damages | $1,880.02 |

**TOTAL            =        $14,762.04**

So ordered.

Dated at Bridgeport, Connecticut, this 6th day of October 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge